# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

**DENNIS G. COLLINS, SUZANNE J. COLLINS, DAVID BUTLER, LUCIA BOTT, and all others similarly situated,**

        **Plaintiffs,**

        **v.**

**METROPOLITAN LIFE INSURANCE COMPANY,**

        **Defendant.**

**Court No.**

*JURY TRIAL DEMANDED*

## COMPLAINT AT LAW

Plaintiffs, Dennis Collins, Suzanne Collins, David Butler, and Lucia Bott (collectively, "Plaintiffs"), by their attorneys, hereby plead, on their behalf and on behalf of all others similarly situated, and complain against Defendant, Metropolitan Life Insurance Company (hereinafter "Met Life"), as follows:

### *Nature of the Action*

1. This lawsuit seeks compensation and other relief arising from fraud, breaches of contract and other misconduct committed by Met Life in connection with the pricing, marketing, and sale of Met Life's individual long-term care insurance policies.

2. Specifically, Met Life's "5% Automatic Compound Inflation Protection Rider" that was sold as an additional benefit with the long-term care policies falsely and misleadingly promised policyholders, such as Plaintiffs, that their "benefit amounts will automatically increase each year with no corresponding increase in premium."

3. Further, Met Life told insureds that purchased the "5% Automatic Compound Inflation Protection Rider" that "Your premium is not expected to increase as a result of the benefit amount increases provided by this Rider. However, We reserve the right to adjust premiums on a class basis."

4. Met Life did not inform insureds how future premium increases were to be determined.

5. Plaintiffs paid more than double their base premiums in exchange for the "5% Automatic Compound Inflation Protection Rider" and its promise of increased benefits with no corresponding increase in premiums.

6. But Met Life's promises were lies. Plaintiffs' base premiums, and those premiums paid for the Rider, were directly tied or related to the increasing daily benefit amounts provided by the Rider. There was a corresponding rate increase. The premiums increased multiple times as a direct result of the benefit amount increases provided by the Rider.

7. This lawsuit is now necessary to enjoin Met Life for continuing its illegal conduct, to disgorge the amounts paid by insureds to Met Life for the fraudulently sold Rider, and to compensate Plaintiffs, and all others similarly situated, for all damages proximately caused by Met Life's misconduct. Such damages will be demonstrated at trial according to the proofs but, on information and belief, currently exceed five million dollars.

*Jurisdiction and Venue*

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class is a citizen of a different state than defendants, there are more than 100 members of the Class, and

upon information and belief the aggregate amount in controversy exceeds $5,000,000.00 exclusive of interest and costs.

9.     Venue is appropriate because Met Life is a citizen of the State of New York. Moreover, venue lies in this district as Met Life systematically transacts business here and the causes of action set forth in this Complaint arose, in whole or in part, in the State of New York.

*The Parties*

10.     Plaintiff Dennis G. Collins is an individual who resides in St. Louis, Missouri, and is the owner of the Met Life long-term care insurance policy number 14363-24070.  Along with his policy, Plaintiff Dennis G. Collins also purchased Met Life's "5% Automatic Compound Inflation Protection Rider."

11.     Plaintiff Suzanne J. Collins is an individual who resides in St. Louis, Missouri, and is the owner of the Met Life long-term care insurance policy number 14363-24073.  Along with her policy, Plaintiff Suzanne J. Collins also purchased Met Life's "5% Automatic Compound Inflation Protection Rider."

12.     Plaintiff David Butler is an individual who resides in St. Louis, Missouri, and is the owner of the Met Life long-term care insurance policy number 14363-24077.  Along with his policy, Plaintiff David Butler also purchased Met Life's "5% Automatic Compound Inflation Protection Rider."

13.     Plaintiff Lucia Bott is an individual who resides in St. Louis, Missouri, and is the owner of the Met Life long-term care insurance policy number 14363-24084. Along with her policy, Plaintiff Lucia Bott also purchased Met Life's "5% Automatic Compound Inflation Protection Rider."

14.     Defendant Met Life is a corporation organized under the laws of the State of New York, with its principal place of business in New York, New York, and is a citizen of New York.

### *Factual Allegations*

15.     Since 1986, Met Life has been in the business of pricing and selling individual long-term care insurance policies.

16.     Met Life knew that the reasons people purchase long-term care insurance include the desire to avoid exhausting assets for long-term care, to exercise choices regarding the type of care received, and to protect family members from having to pay for long-term care.

17.     Met Life also knew that a substantial number of people seeking long-term care insurance coverage lived on fixed incomes with limited financial means.

18.     Met Life sold long-term care insurance in blocks of policies over a fixed duration. For example, a policy or policy form would be offered over a specific time period, i.e. 2002 to 2006, and then closed.  There would then be a fixed number of insureds that purchased a specific policy form during a specific time period.

19.     Met Life offered multiple incentives—including riders and premium payment options—to those applying for long-term care insurance. The incentives were intended to assuage applicants/policyholders' concerns regarding future premium increases and coverage benefits. One such incentive was the "5% Automatic Compound Inflation Protection Rider."

20.     On or around February 1, 2007, Plaintiffs purchased their Met Life Long-Term Care Insurance policies (hereinafter, the "Policies").  Such Policies are attached hereto as ***Exhibits A, B, C, and D***.

21.    Met Life did not disclose or reveal to Plaintiffs, or any other purchasers of long-term care coverage, the factors that it considered when determining the initial premium pricing or the factors it would consider when determining future premium increase.

22.    When Plaintiffs purchased the Policies, they separately purchased the Inflation Protection Rider (hereinafter, the "Rider"). Copies of the Rider are included at page LTC2-5AP of the Policies, *Exhibits A-D*.

23.    In the policies, Met Life described the Rider as follows:

Automatic Compound Inflation Benefit. Your benefit will automatically increase each year *with no corresponding increase in premium*. The amounts of the increases are equal to five percent (5%) of the benefit amounts in effect at the end of the prior Policy Year…. The benefit amount increases will occur on each Policy Anniversary for the lifetime of Your policy, even when you are receiving Benefits. These increases will be made without regard to Your age, claim status, claim history, health, or the length of time You have been covered under the policy. *Your premium is not expected to increase as a result of the benefit amounts increases provided by this Rider. However, We reserve the right to adjust premiums on a class basis.*

*See* Rider, LTC2-5AIP, *Exhibits A-D* (emphasis added).

24.    Plaintiffs paid additional annual premiums that more than doubled the price of their annual base premium in exchange for the promises made and benefits provided by the Rider. For instance, Plaintiff Dennis Collins' initial base annual premium was $2,182.61. His additional annual charge for the Rider was $2,334.96. Plaintiff Suzanne Collins' initial base annual premium was $597.39. Her additional annual charge for the Rider was $948.99.

25.    Similarly, Plaintiff David Butler's initial base annual premium was $1,294.79. His additional annual charge for the Rider was $1,793.50. Likewise, Plaintiff Lucia Bott's initial base annual premium was $1,405.55. Her additional annual charge for the Rider was $1,871.43.

26.    Beginning in or around February 2015, and then subsequently in February 2018 and February 2019, Plaintiffs received notice from Met Life of substantial increases in premiums.

27.     Met Life informed Plaintiffs of one such increase in November 2019 and, consistent with all communications related to rate increases, stated that Met Life was "committed to ensuring that [their] pricing is appropriate to the benefits and risks of our products."

28.     Met Life, at the time it announced the increases, informed Plaintiffs that when it initially priced the long-term care insurance products that it considered many factors including persistency rates, mortality rates and morbidity rates.

29.     Met Life, at the time it announced the increases, informed Plaintiffs that it was after an in-depth analysis, presumably of these identified factors, that it determined "a premium increase is necessary on certain long-term care insurance policies."

30.     Between when Plaintiffs purchased their policies and when Met Life implemented each of the rate increases, the persistency rate did not change, the mortality rate did not change, nor did the morbidity rate change.

31.     The only appreciable change between when Plaintiffs purchased their policies and when Met Life implemented class wide rate increases, on each occasion, for both purchasers of the Rider and class members that did not purchase the rider, was that the future daily benefit amount for purchasers of the rider, projected over decades, increased to an unrealistic number and provided the sole basis for the implementation of class-wide rate increases.

32.     Based on the terms and conditions of the policy, Met Life was responsible for paying the insured's actual daily cost of long term care up to the daily benefit amount for the benefit period.  For example, if an insured purchased coverage, including the 5% compound daily benefit rider and elected a 3-year benefit term, and had accumulated a daily benefit amount of $500 and went on claim and the actual daily cost of long-term care was $275, Met Life was responsible for paying $275 per day (not $500) for up to 3 years (benefit period).

33.     In support of requested premium increases on the policy series held by Plaintiffs (VIP2 Series) Met Life submitted and or filed with State Departments of Insurance, including but not limited to Missouri and Illinois, supporting documentation including memoranda with Exhibit tables that purported to demonstrate "Projected Future Experience" on a nationwide basis.

34.     On information and belief, Met Life submitted memoranda with Exhibit tables that purported to demonstrate "Projected Future Experience" on other policy series that included inflation protection riders.

35.     On information and belief, Met Life used the same methodology it used in VIP2 Series for calculating and/or demonstrating "Projected Future Experience" in support of premium increases in support of increases on other policy series.

36.     The submissions and aforementioned memoranda included the following statements by Met Life:

        a.  "In general, the rate action addresses primarily future experience and does not seek to recover historical losses."

        b.  "The daily benefit amount and the maximum benefit period are selected at issue."

        c.  "At issue, the insured had the option of choosing one of the following benefit increase riders: 5% Compound, 5% Simple, or Future Purchase (in some states, a 3% Compound Inflation Rider was also available)."

        d.  "Premiums are unisex, but vary by issue age, rating class, benefit period, initial daily benefit, waiting period, home and community care percentage, inflation protection option, payment method, premium mode and the selection of any other options or riders."

e. "Annual loss ratios are calculated, with and without interest, as incurred claims divided by earned premiums."

f. "Earned premiums for projection years 2015 through 2095 are developed by multiplying each prior period's earned premium (starting with December 30, 2014 actual earned premium) by a persistency factor."

g. "Each projection year claim amount is calculated by multiplying incidence, continuance and utilization factors by the policy and rider benefits on a seriatim basis."

37. Met Life admitted to insureds that the pricing is tied to the benefits provided. What Met Life knew when it sold the products and each time it implemented premium increases, but did not tell insureds, was that the projected daily benefit amounts, inflated to unreasonable levels, would be used to establish projected future losses and provided the primary basis and support for the rate increases.

38. For past annual loss ratios, Met Life considered the actual amount of the claims incurred (see ¶36(e) *supra.*)

39. Met Life did not consider the actual daily cost (average or otherwise) of long-term care when calculating projected future losses (see ¶36(g) *supra.*).

40. When calculating future claim amounts and, consequently, projected future loss ratios that supported premium rate increases, Met Life used "the policy and rider benefits", specifically the daily benefit amounts. (see ¶36(g) *supra.*)

41. Met Life knew at the time it sold the Policies and the Rider how it would determine future rate increases on a class-wide basis.

42.     Met Life knew at the time it sold the Policies and the Rider that seeking and/or obtaining future rate increases would depend on projected future losses.

43.     Met Life used the compound daily benefit amounts due to purchasers of the Rider to determine projected future losses – that is, the increased daily benefits promised to purchasers of the Rider would in turn generate losses for Met Life.  Those projected losses would then be utilized by Met Life purportedly to justify raising premiums on all purchasers of Met Life long term care policies, including of course Plaintiffs.

44.     Met Life knew that its statement that the "5% Compound Daily Benefit Rider" provided an increase in daily benefit amount without a "corresponding increase" in premium was and is false.

45.     Specifically, Met Life knew that by promoting and selling the 5% Rider it was securing the projectable losses that would justify future rate increases.

46.     Met Life knew that by promoting and selling the Rider it would use the increased daily benefit amounts to seek future rate increases on a class-wide basis.  As a result, Met Life's statement that "[y]our premium is not expected to increase as a result of the benefit amount increases provided by this Rider" was and is false.

47.     86% of purchasers of VIP2 Series Long Term Care policies purchased either the 5% compound daily benefit rider or the 5% simple daily benefit rider.

48.     Met Life not only expected but knew at the time that it sold the Policies and the Rider that it would increase premiums on a class-wide basis, including for purchasers of the Rider, based on the future daily benefit amount increases.

49.     Met Life intended for purchasers of the Rider to rely on its statement that "[y]our premium is not expected to increase as a result of the benefit amount increases provided by this Rider."

50.     Plaintiffs (like other purchasers of the Rider) reasonably believed that by purchasing the Rider they were limiting the risk of future rate increase by paying more than double premiums to secure an increasing daily benefit when, in fact, they were merely providing Met Life with the basis on which to demonstrate projected future losses which Met Life deliberately exploited to justify the need for future rate increases. Indeed, the benefit amount increases allegedly justified by the Rider were precisely the basis for the very premium increases that Met Life falsely stated were not going to occur.

51.     The heart of Met Life's misconduct is the sale of the Rider to fraudulently justify the deliberate and unwarranted increases in Met Life premiums for long-term care policyholders. To pursue that scheme, Met Life had to show that future claims would far exceed future revenues. The estimated future revenues are straightforward and reasonable. They assume a constant revenue per person, with a gradually declining number of people per year due to death and lapses.

52.     But Met Life's estimation of future claims is deliberately opaque and unreasonable. On information and belief, Met Life assumes that the daily benefit paid per person increases at a rate of 5% per year on both a compound or simple basis.

53.     Indeed, a review of Met Life filings from 2013 through 2016 from certain state department of insurance with which Met Life sought to justify its rate increases suggests that Met Life used the future daily benefit amounts, increasing at 5% per year through 2075, to calculate its future liabilities.

54. Thus, Met Life had an incentive to allay purchasers' fears by disclaiming a connection between purchasing the Rider and a future rate increase in order to sell the Rider and thereby maximize the predicted incurred claims and minimize the predicted earned premiums by assuming that prices would increase by 5% per year and obscuring this fact in their documentation.

55. The Rider provides only one clear benefit – that is, it forms the basis by which Met Life may project future loss rates that purportedly justify Met Life's demand for higher premium.

56. Stated simply, the Rider is little more than a pig in a poke – charging Plaintiff double their premiums with no meaningful benefit while, at the same time, giving Met Life the basis to charge higher premiums to all purchasers of its long-term care policies, including Plaintiffs.

57. To accomplish its scheme, Met Life concealed material information when Met Life was under a duty to disclose. Such a duty arises when, *inter alia*, a defendant possesses specialized knowledge not available to the purchaser and then makes misleading statements that are, at best, only half-truths while deliberately omitting crucial material facts that purchasers would reasonably need to make an informed decision.

58. By this misconduct, Met Life has misleadingly charged and collected tens or even hundreds of millions of dollars in unwarranted premiums. Such damages are described in detail below.

### *Class Allegations*

59. Plaintiffs brings this action on behalf of themselves, and all others similarly situated, pursuant to Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons in the United States who purchased an individual long-term care insurance policy from Met Life (or a subsidiary or affiliate thereof) and selected the

"5% Automatic Compound Inflation Protection Rider" at any time during the period from January 1, 1986 to the present and have been subjected to a class-wide rate increase that increased their base premium and the premium/charge paid for the "5% Automatic Compound Inflation Protection Rider."

60.     The Class is so numerous that joinder of all members is impracticable. Due to the nature of the trade and commerce involved, Class members are geographically dispersed throughout the United States. On information and belief, there are over four thousand Class members.

61.     Plaintiffs' claims are typical of the claims of the other members they seek to represent because Plaintiffs and all Class members purchased an individual long-term care insurance policy from Met Life and purchased the Rider.

62.     Plaintiffs will fully and adequately protect the interests of all Class members. Plaintiffs have retained counsel experienced in complex class action and insurance litigation. Plaintiffs have no interest that is adverse to, or in conflict with, other Class members.

63.     Questions of law and fact common to all Class members predominate over any questions that may affect only individual members.

64.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable. The prosecution of separate actions by individual Class members would impose heavy burdens upon the courts, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to all policyholders. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

65.     The interest of Class members in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. The damages suffered by the individual members are uniform, and the expense and burden of individual litigation might make it virtually impossible for them to redress the wrongs done to them. Plaintiffs anticipates no difficulty in the management of this action as a class action.

### Count I
### Common Law Fraud

66.     Plaintiffs repeat and reallege the allegations of paragraphs 1 through 65 as if fully set forth herein.

67.     Plaintiffs bring this claim on their behalf and on behalf of all Class members.

68.     Met Life's conduct was fraudulent in one or more of the following ways:

69.     First, Met Life marketed and sold the Rider with the promise that the Rider provided insureds increased benefits with no corresponding increases in premiums.

70.     But at the time Met Life sold individual long-term care policies with the Rider, Met Life knew that it would levy significant, future, class-wide premium increases that were directly related (i.e. corresponded to) the increased future daily benefit amounts provided by the Rider.

71.     Second, at the time Met Life sold the Policies and the Rider, Met Life knew how future rate increases would be determined and that the increased daily benefits promised by the Rider would result in projected loss ratios that would correspond directly with the basis on which future rate increases would be determined.

72.     Thus, Met Life's fraud lies ***not*** in the amount charged for the Rider, or the fact that Met Life obtained rate increases nor the amount or extent of the rate increases. Further, Met Life could have remained silent on the relationship between increased daily benefit amounts and future

rate increases and not been guilty of fraud. Instead, Met Life affirmatively represented 1) that there was no corresponding relationship between the increased daily benefit amounts and future rate increases, and 2) that insureds' premiums were not expected to increase as a result of purchasing the rider, when it knew both statements were false.

73. In February 2015, then again in February 2018 and 2019, Met Life levied premium rate increases, substantially increasing the annual cost of the Rider.

74. In support of each increase levied on Plaintiffs and nearly all other insureds, Met Life filed an actuarial memorandum in support of each increase sought. These actuarial memoranda, obtained through FOIA requests, are the only way that Plaintiffs and all other insureds could discover that Met Life used the projected increased daily benefit amounts to substantiate the loss ratios often necessary to implement the increased premiums.

75. Met Life falsely stated to purchasers of the Rider: "Your premium is not expected to increase as a result of the benefit amount increases provided by this Rider."

76. Met Life falsely stated to insureds who purchased the Rider – and who had paid more than double in annual premium to receive the benefits of such rider – that they would receive increases in benefits with "no corresponding increase in premium."

77. Met Life's statement that there would be "no corresponding increase in premium" was false for one or more of the following reasons:

      a. Met Life knew that the increased benefit amounts promised by the Rider were not, in fact, unrelated to future rate increases but instead would be used to calculate future liabilities and provide the basis upon which future rate increases were sought and obtained.

78.     Met Life's statement that "*[y]our premium is not expected to increase as a result of the benefit amounts increases provided by this Rider*" was false for one or more of the following reasons:

> a.Met Life, at the time it made the statement, knew the methodology it would use to implement future premium increases and further knew that insureds, by purchasing the 5% Compound Daily Benefit Rider and other inflation protection riders, artificially inflated the amount of projected future claims and, consequently, projected future loss ratios.

> b.Met Life utilized and relied on the projected future claims and loss ratios to seek and implement premium rate increases.

79.     Met Life intended that Plaintiffs rely, and Plaintiffs did in fact rely, on such misrepresentations when purchasing the Policies and the Rider.

80.     Plaintiffs would not have purchased the Rider had they known Met Life intended and planned to use the increased daily benefit amounts to secure future rate increases.

81.     As a direct result of the foregoing misrepresentations, Plaintiffs suffered damages in the form of separate premiums paid for the Rider. As a result, Plaintiffs now seek, among things, disgorgement of the ill-gotten gains Met Life fraudulently seized from Plaintiffs and those similarly situated.

82.     Such damages will be determined at trial according to the proofs but in any event now exceed five million dollars.

## *Count II*
## *Fraudulent Concealment*

83.     Plaintiffs repeat and reallege the allegations of paragraphs 1 through 82 as if fully set forth herein.

84.     Plaintiffs bring this claim on their behalf and on behalf of all Class members.

85.     At the time that Met Life sold the Policies and the Rider, Met Life knew the methodology it would employ to seek and obtain future premium increases. Specifically, Met Life knew that its methodology for justifying future premium increases was based upon the increased daily benefit amounts provided by the Rider.

86.     Despite such knowledge, Met Life did not disclose to Plaintiffs or other purchasers that the increased daily benefit amounts promised by the Rider would be used by Met Life to seek and justify future premium increases.

87.     At the time it sold the Policies and the Rider, Met Life had a duty to disclose its knowledge and methodology to Plaintiffs and other purchasers.

88.     Such duty arises because of the nature of the relationship between Met Life and Plaintiffs and includes the following critical facts:

   a.   Met Life had, and has, vastly superior knowledge about its methodology for determining future premium increases. Indeed, Met Life, and only Met Life, understood special facts about the Rider and its effects on premium increases. These facts were wholly unknown to Plaintiffs.  Such special facts include Met Life's very methodology that increased benefits that the Rider promised was the basis upon which Met Life would raise premiums in the future;

   b.   Met Life failed to disclose to Plaintiffs this key information and Met Life knew that these facts were crucial to Plaintiffs' decision about whether to purchase the Rider; and

     c.  Met Life's disclosures and promises about the purported benefits of the Rider were, at best, half-truths. In making such statements Met Life failed to speak truthfully and completely about the consequences of purchasing the Rider.

89.    Met Life intended that Plaintiffs rely on its omissions and acts of concealment when deciding to purchase their long-term care insurance policies with the Rider.

90.    Plaintiffs would not have purchased the Rider had they known Met Life planned to substantially increase the premium associated with the Rider.

91.    As a direct result of the foregoing misrepresentations, Plaintiffs suffered damages in the form of heightened premiums paid to maintain long-term care coverage that they had already purchased. As a result, Plaintiffs now seek, among things, disgorgement of the ill-gotten gains Met Life fraudulently seized from Plaintiffs and those similarly situated.

92.    Such damages will be determined at trial according to the proofs but in any event now exceed one million dollars.

### Count III
### *Violation of the State Consumer Fraud and Deceptive Business Practices Acts*

93.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 92 as if fully set forth herein.

94.    Plaintiffs bring this claim on their behalf and on behalf of all Class members.

95.    Met Life violated applicable state statutory prohibitions against fraud and deceptive practices, including Section 407.020 of the Missouri Merchandising Practices Act, Section 359 of the New York Deceptive Practices Act, and Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, in one or more of the following respects:

96.    First, when selling the Rider, Met Life stated the following:

Automatic Compound Inflation Benefit. Your benefit will automatically increase each year with no corresponding increase in premium. The amounts of the increases are equal to five percent (5%) of the benefit amounts in effect at the end of the prior Policy Year.

97.     The foregoing statements were "deceptive" for one or more of the following reasons:

a.  The foregoing statements had the capacity to deceive consumers, including Plaintiffs, into believing that Met Life could not increase the premiums individuals paid for individual long-term care insurance policies and/or the Rider.

b.  The foregoing statements had the capacity to deceive consumers, including Plaintiffs, into believing that Met Life would provide increased benefits with no corresponding increase in base premium and the premium paid for the Rider.

98.     Met Life intended that Plaintiffs rely on the foregoing deceptive statements when deciding to purchase an individual long-term care insurance policy and/the Rider.

99.     Met Life made the foregoing deceptive statements in the conduct of trade or commerce—namely the sale of individual long-term care insurance policies and/or the Rider.

100.    Plaintiffs relied on the foregoing deceptive statements when deciding to purchase the Rider.

101.    Plaintiffs would not have purchased the Inflation Protection Rider if they knew its associated benefits provided Met Life the basis on which to increase future premiums.

102.    As a direct result of the foregoing misrepresentations, Plaintiffs suffered damages in the form of paying a separate premium for the Rider.

103. Second, Met Life's decision to increase the premium Plaintiffs paid for the Rider violated public policy—particularly those standards of conduct set forth in applicable state statutory protections, including the Missouri Merchandising Practices Act, the New York Deceptive Practices Act, and the Illinois Consumer Fraud and Deceptive Practices Act, as well as other provisions of applicable state insurance codes and common law doctrines governing the marketing and sale of insurance products.

104. Met Life's decision to increase the premiums Plaintiffs paid was immoral, unethical, oppressive, and/or unscrupulous because it forced Plaintiffs to do one of the following: (1) pay a premium more than two times greater than the premium Plaintiffs had agreed to pay; (2) reduce the coverage for which they had previously contracted; (3) or cancel the coverage altogether.

105. If Plaintiffs canceled their coverage, they would not have been able to obtain individual long-term care insurance from another insurer at the price they had been paying.

106. Thus, to maintain the long-term care insurance coverages Met Life promised, Plaintiffs had no choice but to pay the increased premiums or reduce benefits beginning February 2015.

107. Plaintiffs suffered substantial damage because they were forced to pay higher premiums and/or reduce benefits in contradiction to what they were promised. As a result, Plaintiffs now seek, among other things, disgorgement of the ill-gotten gains Met Life fraudulently seized from Plaintiffs and those similarly situated.

108. Such damages, suffered by Plaintiffs and all Class members, will be demonstrated at trial according to the proofs but in any event now exceed one million dollars.

### Count IV
### *Breach of Good Faith and Fair Dealing*

109. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 108 as if fully set forth herein.

110. Plaintiffs bring this claim on their behalf and on behalf of all Class members.

111. Plaintiffs and Met Life were parties to contracts, namely, the Policies and the Rider.

112. Every contract relating to the sale of goods or services imposes an obligation to act in good faith in its performance or enforcement.

113. Met Life's conduct deprived Plaintiffs of the right to receive the very benefits that were expressly contemplated by the Policies and the Rider.

114. Any reasonable person in the position of Plaintiffs would be justified in believing that there was no relationship between the increased daily benefit amount and future rate increases. Met Life went to great lengths to affirmatively create that belief through the express statements it included in the Policy.

115. Such promise is not contrary to any express provision in the Policies and Rider.

116. Met Life's conduct essentially rendered the promises of the Rider worthless to Plaintiffs and Met Life's conduct was inconsistent with the Rider's express purpose. As a result, Met Life breached its duty of good faith and fair dealing.

117. As a direct result of such breaches, Plaintiffs suffered damages in the form of premiums paid for the Rider.

118. Such damages will be determined at trial according to the proofs but in any event now exceed one million dollars.

### *Request for Relief*

**Wherefore**, Plaintiffs demand the following relief on behalf of themselves and all others similarly situated:

A.     That an Order be entered certifying this action as a Plaintiff Class action under Federal Rule of Civil Procedure 23;

B.     Compensatory damages in such amount as demonstrated by the proofs at trial and that the Court deems just and proper;

C.     Disgorgement of all premiums paid for the Rider by Plaintiffs and all others similarly situated;

D.     Punitive damages relating to Met Life's fraud and other misconduct for which such damages are available and in an amount that the Court deems just and proper;

E.     Imposition of a constructive trust, an order granting recessionary and injunctive relief and other such equitable relief that the Court deems just and proper;

F.     An appropriate claims resolution facility, funded by Met Life, to administer relief to the Class in this case;

G.     All statutory damages including all exemplary damages available under any applicable statutory provision;

H.     Costs of litigation and attorneys' fees; and

I.     All other appropriate relief.

### *Jury Trial*

119.     Plaintiffs request a jury trial on all claims that may so be tried.

Dated:  February 1, 2022

Respectfully submitted,

**DENNIS G. COLLINS, SUZANNE J. COLLINS, DAVID BUTLER, LUCIA BOTT, and all others similarly situated,** *Plaintiffs*

By: /s/  Robert R. Duncan
                One of their Attorneys

| | | |
|---|---|---|
| Robert R. Duncan | Steven Mikuzis | Thomas C. Cronin |
| Registration No.: 6277407 (IL) | Registration No.: 6279289 (IL) | Registration No.: 6204065 (IL) |
| Duncan Law Group, LLC | Mag Mile Law, LLC | Cronin & Co., Ltd. |
| 161 North Clark Street | 535 North Michigan Avenue | 120 North LaSalle Street |
| Suite 2550 | Suite 200 | 20th Floor |
| Chicago, IL 60601 | Chicago, IL 60611 | Chicago, IL 60602 |